AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
6/16/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ CG ___ DEPUTY

United States of America

v.

NOEMY ESPINOZA,

Defendant(s)

**FILED**
CLERK, U.S. DISTRICT COURT
JUNE 16, 2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ AF ___ DEPUTY

Case No.   2:22-mj-02368-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 15, 2022, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Paul Welch*
*Complainant's signature*

Paul Welch, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   June 16, 2022

*Judge's signature*

City and state:   Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Paul Welch, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against NOEMY ESPINOZA ("ESPINOZA") for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), in the custody of Homeland Security Investigations, Los Angeles International Airport, as described more fully in Attachment A: a gray Apple iPhone, found in the center console of the car ESPINOZA was driving when she was arrested.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest

warrant, and search warrant, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with Homeland Security
Investigations ("HSI") and have been so employed since June
2017.  As a SA with HSI, I am authorized to investigate crimes
involving violations of federal law.  I am currently assigned to
the HSI Los Angeles International Airport office Border
Enforcement Security Taskforce ("HSI LAX BEST"), where I
investigate violations of immigration and customs laws,
including large-scale drug trafficking.

6.    I am a graduate of the Federal Law Enforcement
Training Center in Glynco, Georgia.  While there, I completed
courses concerning criminal investigative functions, criminal
law, immigration law, and customs law.  I also completed
training specifically related to the investigation of
international narcotics trafficking and related offenses, such
as the unlawful importation, transportation, and distribution of
controlled substances.  During the course of my employment with
HSI, I have received several hundred hours of comprehensive,
formal instruction on topics such as drug identification, money
laundering techniques, patterns of drug trafficking, complex
conspiracies, the exploitation of drug traffickers'
telecommunications devices, surveillance, and other

investigative techniques.  I have led and assisted in investigations into the unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of drugs and other controlled substances, and conspiracies involving drugs and controlled substance offenses.

7.   Prior to working for HSI, from February 2011 to 2015, I was a Border Patrol Agent with U.S. Customs and Border Protection.  From 2015 to 2017, I was a Deportation Officer with U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations.

### III.  SUMMARY OF PROBABLE CAUSE

8.   On May 11, 2022, ESPINOZA sold approximately 935 grams of methamphetamine to an individual she believed was a drug customer, but who was in fact a confidential informant ("CI") working for HSI.

9.   On June 15, 2022, ESPINOZA sold approximately 4.8 kilograms of methamphetamine to the same CI.  Investigators searched the car ESPINOZA drove to conduct the drug transaction and recovered an additional 3.4 kilograms of methamphetamine. During the search, investigators also found the SUBJECT DEVICE in the car's center console.

### IV. STATEMENT OF PROBABLE CAUSE

10.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.    Background of Drug Trafficking Investigation

11.   On or about October 15, 2021, a confidential informant (the "CI")[1] told HSI SA Kairo Ortez and me about a Mexico-based narcotics broker known to the CI as "Flaco."  The CI explained that he/she previously met Flaco in the United States while the CI was in prison, but that Flaco had since been deported to Mexico.

12.   The CI stated that he/she could order large quantities of methamphetamine, cocaine, or counterfeit oxycodone (known as "M30") pills from Flaco.  The CI further explained that he/she could arrange drug deals with Flaco by communicating with Flaco on the WhatsApp application.  According to the CI, Flaco would not sell anything less than two pounds of methamphetamine, one-half kilogram of cocaine, or 2,000 "M30" pills.  Based on my training and experience, I know that Mexico-based drug trafficking organizations distribute "M30s" within the Los Angeles area.  These "M30s" are often counterfeit fentanyl-laced oxycodone pills.

13.   According to the CI, once an order was placed, the CI believed that Flaco would contact other members of his organization in California, who would deliver the narcotics on his behalf.  The CI explained that he/she believed Flaco had different suppliers who would deliver the methamphetamine,

---

[1] The CI is working with HSI in exchange for potential consideration in an ongoing criminal investigation in which the CI has not been charged with a crime.  The CI has prior criminal convictions for drug trafficking and theft.  The CI has provided information in the past that has been corroborated and led to the seizure of narcotics.

cocaine, or M30 pills.  SA Ortez and I instructed the CI to continue communicating with Flaco so that we could arrange a controlled purchase of narcotics.

14.  On November 29, 2021, the CI sent SA Ortez voice recordings from Flaco.  In the voice messages from Flaco, Flaco stated, "I have something over there . . . I give you one good price . . . today, tomorrow, and Sunday . . . I give you good price."  SA Ortez and I instructed the CI to continue to communicate with Flaco.

15.  On January 11, 2022, SA Ortez and I had a call with the CI.  During the meeting, the CI stated that he had continued to communicate with Flaco, as instructed.  The CI told SA Ortez and I that he/she could arrange a drug transaction with Flaco. The CI sent SA Ortez multiple copies of voice messages he/she had received from Flaco between December 11 and 26, 2021.  In one of the voice messages, Flaco used coded language to offer to sell narcotics by saying he could provide the CI with "two movies, part one and part two of Scarface."  The CI stated that "Scarface" was a reference to cocaine and that "part one" meant one-half of a kilogram of cocaine and "part two" meant a full kilogram of cocaine.

16.  On April 13, 2022, SA Ortez and I met with the CI at the HSI office in El Segundo, California.  SA Ortez and I instructed the CI to continue communicating with Flaco.

17.  On May 2, 2022, Group Supervisor Michael Corkery and I met with the CI.  During this meeting, we reviewed WhatsApp voice messages between the CI and Flaco.  In these voice

messages, Flaco stated that he had narcotics available and that he could arrange a drug transaction as soon as the CI requested. HSI investigators instructed the CI to order two pounds of methamphetamine from Flaco.

18. On May 5, 2022, I, along with other HSI investigators and Long Beach Police Department detectives met with the CI to arrange a controlled purchase of two pounds of methamphetamine from Flaco. In my presence, and the presence of investigators, the CI communicated with Flaco via WhatsApp. Flaco said he could have a then-unknown female deliver the methamphetamine, but it would take several hours for her arrive because she was coming from San Diego. Investigators later identified the unknown female individual as ESPINOZA, as discussed further below. Investigators instructed the CI to arrange the drug transaction for a later date and time. In the WhatsApp communications, Flaco agreed to sell two pounds of methamphetamine for $2200. Flaco also sent a voice recording to the CI, which stated, "so you want it for Tuesday or Wednesday? . . . let me know right now for tell my friend . . . and . . . you don't need more? . . . Only two? . . . I give you ten . . . ha,ha,ha[.]"

**B. ESPINOZA Sells Approximately 935 Grams of Methamphetamine to the CI on May 11, 2022**

19. On May 11, 2022, I, along with other HSI investigators and Long Beach Police Department detectives, conducted a buy/walk operation with the CI.

20.  In the morning on May 11, 2022, the CI told me that
ESPINOZA called him/her from a Mexican WhatsApp phone number
ending in -3977.  The CI and ESPINOZA continued to communicate
via WhatsApp.  The CI told me that ESPINOZA would be in Long
Beach, California at 11:40 a.m.

21.  At approximately 11:00 a.m., I, along with other HSI
investigators, met the CI and searched the CI and his/her
vehicle.  We did not find any drugs, drug paraphernalia,
weapons, or large sums of money during the search.  We then
equipped the CI with a sound transmitter and an audio recording
device so we could monitor the buy/walk.

22.  At approximately 11:36 a.m., in the presence of
investigators, ESPINOZA called the CI and said she was in Long
Beach.  At approximately 12:30 p.m., while still in the presence
of investigators, the CI sent a text message to ESPINOZA
instructing her to meet the CI at a Target store located at 950
East 33rd Street in Signal Hill, California.  The CI and
ESPINOZA then engaged in additional conversations, all of which
were transmitted to investigators via the audio-recording
device.  At approximately 12:44 p.m., ESPINOZA called the CI and
told him/her that she was five minutes away.  At approximately
12:49 p.m., ESPINOZA told the CI by telephone that she was in
the Target parking lot.  The CI then gave ESPINOZA his/her
location within the Target parking lot and told her to park in
front of the CI's vehicle.

23.  Moments later, I saw a silver 2015 Nissan Maxima,
bearing California license plate 8MFX882 (the "Maxima") arrive

at the Target parking lot and park in front of the CI's car.
Using law enforcement databases, HSI investigators determined
that the Maxima is registered to ESPINOZA at an address on
Euclid Avenue in San Diego, California.

24.  I saw ESPINOZA get out of the Maxima, walk toward the
CI's car, get into the CI's car, and sit in the front passenger
seat of the CI's car.  ESPINOZA and the CI had a brief
conversation and appeared to conduct a hand-to-hand exchange.
Following the hand-to-hand exchange, ESPINOZA got out of the
CI's car and returned to the Maxima.  ESPINOZA then drove the
Maxima out of the Target parking lot.  HSI investigators
followed the Maxima.

25.  While one group of HSI investigators followed the
Maxima, another group of HSI investigators, including myself,
followed the CI to a debriefing location.  At the debriefing
location, the CI provided the package he/she had received from
ESPINOZA to investigators.  The package contained suspected
methamphetamine, which was in two clear zip-loc bags that were
inside of a red grocery shopping bag.  Investigators tested the
suspected methamphetamine using a TruNarc, and the test came
back positive for methamphetamine.  A DEA chemist later
determined that the substance ESPINOZA sold to the CI was
approximately 935 grams of actual methamphetamine.

26.  Meanwhile, HSI investigators and Long Beach Police
Department detectives continued to conduct surveillance of the
Maxima.  Investigators followed the Maxima to a Walgreens store
located at 9830 Long Beach Boulevard in South Gate, California.

Moments after the Maxima had parked in the parking lot, investigators saw a dark gray Acura arrive in the parking lot. Investigators were unable to see the license plate number on the Acura.  The Maxima then pulled out of the parking spot it was parked in, drove to the Acura, and parked next to it.  ESPINOZA then got out of the Maxima and approached the driver's side of the Acura carrying what appeared to be a CVS plastic bag containing a heavy item.  ESPINOZA appeared to hand the plastic bag to the driver of the Acura before returning to the Maxima and driving out of the parking lot.  Based on my training and experience, these actions are consistent with conducting a hand-to-hand drug transaction.

27.  After the Maxima exited the parking lot, investigators followed the Maxima as it traveled southbound on Interstate 405 and Interstate 5.  After approximately forty-five minutes, the Maxima stopped at a viewpoint rest area near Oceanside, California, where investigators saw ESPINOZA and two minor children, who appeared to be between eight and ten years old, get out of the Maxima and run around.  ESPINOZA and the minor children then got back into the Maxima and continued to drive southbound on Interstate 5.

28.  At approximately 3:38 p.m., investigators saw the Maxima park in front of a Bank of America branch located at 4166 El Cajon Boulevard in San Diego, California.  ESPINOZA got out of the Maxima and conducted an ATM transaction.

29.  Following the transaction, investigators saw ESPINOZA get back into the Maxima and drive to 4079 Euclid Ave, San

Diego, California and park in an alley way.  This is the same physical address (without a specific apartment number) associated with the registration for the Maxima.

30.  Law enforcement database checks revealed ESPINOZA's California Driver's License address is the same address for the Maxima's registration and the same address to which investigators followed the Maxima (with the exception of the specific apartment number).  Investigators reviewed ESPINOZA's driver's license picture and identified her as the woman who sold the CI the methamphetamine and who they followed to the address in San Diego, California.  Investigators also reviewed the WhatsApp profile picture for the account with whom the CI was communicating, and the profile picture was of the same person who sold the CI methamphetamine and who law enforcement followed to the address in San Diego, California.

### C.  ESPINOZA Sells Approximately 4.8 Kilograms of Methamphetamine to the CI on June 15, 2022

31.  One June 13 and 14, 2022, at the direction of SA Ortez and I, the CI communicated with Flaco via WhatsApp to arrange a drug transaction for June 15, 2022.  The CI provided HSI investigators with WhatsApp text message and audio communications between the CI and Flaco, in which Flaco agreed to arrange the sale of $10,000 worth of methamphetamine to the CI.

32.  On June 15, 2022, I, along with other HSI investigators and Long Beach Police Department detectives, conducted a controlled purchase of narcotics with the CI.

33.  On June 15, 2022, at approximately 9:40 a.m., Flaco asked the CI, via WhatsApp, for the meeting address for the drug transaction.  SA Ortez and I reviewed the WhatsApp communications.  SA Ortez and I instructed the CI to tell Flaco that the CI will give him the address for the drug transaction once the CI is done with work.

34.  At approximately 10:55 a.m., the CI provided HSI investigators with WhatsApp text messages that the CI received from ESPINOZA.  ESPINOZA told the CI she was supposed to meet him/her at 1:00 p.m.  ESPINOZA later told the CI that 1:30 would be better, and at the direction of HSI investigators, the CI agreed to that time.

35.  At approximately 11:05 a.m., HSI investigators met the CI and searched the CI and his/her vehicle.  We did not find any drugs, drug paraphernalia, weapons, or large sums of money during the search.

36.  From approximately 11:15 a.m. to 11:55 a.m., in the presence of HSI investigators, the CI communicated with Flaco and ESPINOZA separately via WhatsApp text message.  At approximately 12:00 p.m., the CI was equipped a sound transmitter and an audio and video recording device so we could monitor and record the drug transaction.

37.  At approximately 12:10 p.m., HSI investigators instructed the CI to tell ESPINOZA to meet him/her at a Target store, located at 950 East 33rd Street in Signal Hill, California (the same address from the May 11, 2022 buy/walk operation).  At approximately 12:15 p.m., ESPINOZA sent the CI a

WhatsApp text message informing him/her that she would get to the Target around 1:15 p.m.  At approximately 1:20 p.m., ESPINOZA sent another WhatsApp text message to the CI, informing him/her that she would be arriving at 1:28 p.m.  SA Ortez and I reviewed screenshots of these text messages.

38.  At approximately 1:26 p.m., the CI called ESPINOZA via WhatsApp.  I could hear the call between ESPINOZA and the CI via the audio transmitter.  ESPINOZA told the CI she was in the Target parking lot driving a white Volkswagen.[2]  The CI told ESPINOZA where he/she was located, and at approximately 1:29 p.m., HSI investigators saw a white Volkswagen, bearing California license plate number 8SHU512 pull up next to the CI's car.  The Volkswagen had a female driver and a young male passenger[3] inside.  HSI investigators immediately recognized the female as ESPINOZA, the same woman from the previous drug transaction on May 11, 2022.  ESPINOZA got out of the car with a black duffle bag and a colorful shopping bag and walked to the front passenger door of the CI's car and got inside.  I heard the CI and ESPINOZA agree on the price for the methamphetamine-- $10,000.  I also heard ESPINOZA state that she drove to the Target from San Diego.

39.  At approximately 1:33 p.m., ESPINOZA got out of the CI's car with the black duffle bag and walked back toward the Volkswagen.  HSI investigators saw ESPINOZA place the black

---

[2] The Volkswagen is registered to Enterprise Rent-A-Car.

[3] This was a different child than the children seen with ESPINOZA following the May 11, 2022 buy/walk operation.

duffle bag inside the driver's side passenger door.  ESPINOZA
then got into the driver's seat, drove out of the parking lot,
and headed east on 33rd Street.  HSI investigators and Long
Beach Police Department Officers followed the Volkswagen.

40.  At approximately 1:38 p.m., marked Long Beach Police
Department units conducted a vehicle stop on the Volkswagen at
the intersection of Wardlow Road and Lemon Avenue in Long Beach,
California.

41.  While HSI investigators and Long Beach Police
Department detectives conducted the vehicle stop, investigator
Ortez and I followed the CI to the debriefing location.  The CI
provided the package he/she had received from ESPINOZA to
investigators.  The package contained suspected methamphetamine,
which was contained in four separate bundles wrapped in black
tape inside a colorful shopping bag.  Investigators tested the
suspected methamphetamine using a TruNarc, and the test came
back positive for methamphetamine.  The weight of the suspected
methamphetamine is approximately 4.8 kilograms.

**D.   Investigators Seize Approximately 3.4 Kilograms of
      Additional Methamphetamine from the Volkswagen**

42.  When HSI investigators and Long Beach Police
Department Detectives stopped the Volkswagen, ESPINOZA and a
young male (later determined to be ESPINOZA's 15-year-old son)
were inside.

43.  At approximately 1:53 p.m., HSI investigators searched
the Volkswagen.  During the search, HSI investigators found a
black duffle bag behind the driver's seat containing bundles of

U.S. currency.  SA Ortez recognized the bundles of U.S. currency as the bundles he gave to the CI to purchase the methamphetamine.  HSI investigators also found a black backpack on the floorboard of the front passenger seat where the minor son was sitting.  The black backpack contained three bundles of suspected methamphetamine.  Two of the bundles were wrapped in black tape, and one bundle was wrapped in clear plastic. Investigators tested the suspected methamphetamine using a TruNarc, and the test came back positive for methamphetamine. The weight of the suspected methamphetamine was later determined to be approximately 3.4 kilograms.  HSI investigators also found the SUBJECT DEVICE in the Volkswagen's center console.

44.  Long Beach Police Department detectives transported ESPINOZA and her minor son to the Long Beach Police Department for further processing.

**E.   ESPINOZA's Statements**

45.  At approximately 3:15 p.m., HSI investigators and U.S. Postal Service Inspector Sumyra Duy interviewed ESPINOZA at the Long Beach Police Department.[4]  After investigators advised ESPINOZA of her Miranda rights, ESPINOZA signed a Statement of Rights and agreed to speak with investigators.

46.  ESPINOZA stated that this is the second time that she conducted a drug transaction with her minor children present.

---

[4] After ESPINOZA and her minor son were transported to the Long Beach Police Department, Department of Children and Family Services ("DCFS") interviewed ESPINOZA.  After the interview, the DCFS representative asked SA Ortez and I whether ESPINOZA had trafficked narcotics before, and we informed DCFS that she had.  In response, the DCFS representative told SA Ortez and I that that was what ESPINOZA said during her interview with DCFS.

ESPINOZA further stated that she knew that the packages she was delivering contained illegal drugs, but that she did not know what type of drugs they were.  She also stated that she was paid $500 per drug transportation trip.

47.  At 3:49 p.m., ESPINOZA stated that she would like to speak with a lawyer and investigators ceased ESPINOZA's questioning.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

48.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-

mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

49.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

50.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

17

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

51. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

52.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ESPINOZA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of ESPINOZA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

53.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

54.   For all of the reasons described above, there is probable cause to believe that ESPINOZA has committed a violation of 21 U.S.C. §§ 841(a)(1): Distribution of a Controlled Substance.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>16th</u> day of June, 2022.

_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE